■ In the Matter of JEFFREY R. KORMAN et al., Respondents, v ALICE SACHS et al., Respondents, and LORRAINE BACKAL, Appellant. In the Matter of LORRAINE BACKAL, Appellant, v JEFFREY R. KORMAN et al., Respondents. In the Matter of LORRAINE BACKAL, Appellant, v LEE L. HOLZMAN et al., Respondents.—Judgment, Supreme Court, Bronx County (Carl J. Mugglin, J.), entered on August 17, 1987, which, *inter alia*, confirmed the Referee's report and denied appellant's application to invalidate the designating petition of Lee L. Holzman as candidate for Judge of the Surrogate's Court, Bronx County, and dismissed the proceeding, unanimously affirmed, without costs and without disbursements.

Judgment, Supreme Court, Bronx County (Carl J. Mugglin, J.), entered on August 17, 1987, which, *inter alia*, granted the application to invalidate appellant's designating petition as candidate for Judge of the Surrogate's Court, Bronx County, reversed, on the law, without costs or disbursements, and the respondent Board of Elections is directed to place the name of appellant Lorraine Backal on the ballot as candidate for Judge of the Surrogate's Court, Bronx County, in the Democratic primary election to be held September 15, 1987.

The designating petition of appellant Backal, as a candidate for the office of Judge of the Surrogate's Court of Bronx County, was invalidated by the Supreme Court, after a hearing, because the petition was found to contain less than the 5,000 valid signatures minimally required under Election Law § 6-136 (2) (b) for an office to be filled by all the voters of a county within the City of New York.

Due to the unusual manner in which the office of Surrogate of Bronx County became vacant on July 2, 1987, the time period within which signatures could be obtained was reduced to some 14½ days rather than the 37-day period otherwise available in 1987 *(see,* Election Law § 6-134 [6]; § 6-158 [1]). At the conclusion of the signature-gathering period, appellant Backal filed a petition with the Board of Elections containing

12,138 signatures in which 5,158 were found by the Board to be valid. Upon the subsequent hearing held in the Supreme Court in the instant proceeding to invalidate the petition additional signatures were found to be invalid resulting in a determination that the petition contained only 4,697 valid signatures.

While appellant contends that the Supreme Court improperly invalidated a substantial number of signatures and that, in fact, her petition contains in excess of 5,000 valid signatures, the main thrust of this appeal is directed to a constitutional challenge to section 6-136 (2) (b) of the Election Law insofar as it requires a candidate for Surrogate of Bronx County to submit at least 5,000 valid signatures in order to qualify for the office sought.

We note at the outset that we reject appellant's arguments with respect to the propriety of the Supreme Court's ruling as to the invalidity of particular signatures and adopt that court's factual determination that appellant's petition contained only 4,697 valid signatures.

Our focus is directed to the constitutional challenge to the Election Law. Appellant's constitutional argument is two-pronged. On the one hand, it is urged that requiring submission of the full minimum 5,000 signatures in light of the abbreviated time period which was here available for the collection of signatures—that is, 14½ days rather than the usual 37 days—imposed such an unreasonable burden upon the candidates for the instant position as to constitute an unconstitutional interference with access to the ballot requiring judicial intervention to authorize a proportionately reduced minimum number of signatures. We find little merit in this argument.

While Election Law § 6-116 provides for an alternative method for nomination of a candidate in the event a vacancy occurs within seven days before the last day for circulating designating petitions, it provides no alternative relief for a situation, such as here, where the vacancy arises more than seven days before the last day for circulating petitions. Instead, the statute requires full compliance with minimum signature specifications notwithstanding the reduced time availability for collecting such signatures. That such statutory scheme is not oppressive is in the instant case emphasized by the fact that over 12,000 signatures were collected for the one candidate who has successfully qualified for the office in question, that more than 12,000 signatures were collected on

appellant's behalf within the available period and that almost 12,000 signatures were collected on behalf of another potential candidate who has separately appealed. There has been no showing whatsoever that the failure to obtain a minimum of 5,000 valid signatures on appellant's behalf was in any way occasioned by the reduced time period available rather than by reason of errors in the signature-gathering process. Moreover, a similar number of signatures has been required where the statute itself sets an even more abbreviated time frame than was here available, as in the case of independent nominating petitions in a special election where the 5,000 signatures must be filed "not later than twelve days following the issuance of a proclamation of such election" (Election Law § 6-158 [9]).

We find, however, that appellant's other constitutional argument regarding the disparity of the signature requirements applicable to counties, of comparable population, within the City of New York and elsewhere in the State, is deserving of close scrutiny.

There is no question that the State Legislature is empowered to regulate the conduct of elections in order to insure that they are fair and honest and that order, rather than chaos, accompanies access to the ballot, and it is recognized that a State has a legitimate interest in regulating the number of candidates on the ballot for purposes of preventing the clogging of its election machinery and avoiding voter confusion which would stem from a plethora of frivolous candidacies. *(See, Stroer v Brown,* 415 US 724; *Jenness v Fortson,* 403 US 431.)

Toward that end, the State may fix reasonable standards to assure that a candidate has some level of popular support before that candidate's name is placed on the primary ballot *(Moritt v Governor of State of N. Y.,* 42 NY2d 347). The standards which have been enacted in this State for that purpose are set forth in Election Law § 6-136. That section governs party designating petitions and sets forth the minimum number of signatures necessary for various offices. Subdivision (2) of that section, insofar as here pertinent, provides as follows:

"2. All other petitions must be signed by not less than five per centum, as determined by the preceding enrollment, of the then enrolled voters of the party residing within the political unit in which the office or position is to be voted for, provided, however, that for the following public offices the number of signatures need not exceed the following limits * * *

"(b) For any office to be filled by all the voters of any county or borough within the city of New York, five thousand signatures * * *

"(d) For any office to be filled by all the voters of cities or counties, except the city of New York and counties therein, containing more than two hundred fifty thousand inhabitants according to the last preceding federal enumeration, two thousand signatures".

Appellant argues that requiring a candidate for a county-wide office within the City of New York to submit 5,000 signatures while requiring a candidate for the identical office in a county of comparable population outside the City of New York to submit only 2,000 signatures constitutes an unconstitutional violation of the Equal Protection Clause. It is asserted, and judicial notice is taken of the fact, that there are counties outside the City of New York, such as Nassau, which have populations exceeding that of Bronx County. It is not disputed that under the statute candidates for the office of Surrogate in those counties need file only 2,000 signatures.

It is clear that the statute, on its face, provides for geographically based disparity of treatment of candidates for the same office in counties of substantially equivalent population. The Legislature has determined that in counties outside the City of New York, even though the population of any such county may be equal to or greater than a county within the city, 2,000 signatures is sufficient to demonstrate that the candidate has a significant quantum of community support. Having made the determination that 2,000 signatures demonstrate the necessary community support in Nassau County, with a population of well over a million inhabitants, it is irrational to require 2½ times that number, or 5,000 signatures, to establish the requisite support in Bronx County, with a lesser population, merely because the latter county falls within the boundaries of the City of New York. To uphold a statutory scheme that, in effect, holds that the level of commitment to and support of a candidate manifested by the signature of a Nassau County voter has 2½ times the worth of that manifested by the signature of a Bronx County voter, is to ignore "one-person-one-vote" equal protection standards.

Respondents argue that the record here is insufficient to make a determination as to the statute's validity because they had no opportunity to present proof as to the distinctions between counties within and without the City of New York which would render the disparties provided for rational and,

while acknowledging the inability to determine the legislative history of those provisions, arguments are offered regarding the physical distinctions between rural and urban areas, population density and the like. Although it is doubtful whether Nassau County or the Cities of Buffalo, Rochester or Syracuse can be characterized as "rural", any such arguments are, in any event, wholly irrelevant. While greater distances between the residences of voters may impact upon the ease, or lack thereof, in approaching such voters (and it is questionable whether visiting a block of individual private homes seeking signatures presents any greater difficulties than the quest to gain admittance to New York City high-rise buildings where doormen exercise fortress-like tenacity in "keeping out" petition carriers), demographic differences among the various counties of the State have no relevance whatsoever on the critical issue of what number of signatures is necessary to demonstrate that the particular candidate has substantial community support. Respondents have not made a sufficient showing that they could produce any evidence that would justify the requirement for a greater number of signatures within the City of New York, in order to demonstrate such support, than in counties of equivalent population outside the city.

The geographically based disparity under our Election Law is equally as infirm as the similarly discriminatory disparate qualifying requirements imposed by the Illinois Legislature for the equivalent offices of ward committeeman in Cook County and township committeeman elsewhere in Illinois. Requiring signatures of 10% of the voters in Cook County in distinction to 5% elsewhere in the State was held to be violative of the Equal Protection Clause and an unconstitutional restriction on access to the ballot. (Gjersten v Board of Election Commrs., 791 F2d 472; cf. also, Illinois Elections Bd. v Socialist Workers Party, 440 US 173.) Subdivision (2) (b) of Election Law § 6-136, to the extent it requires 5,000 signatures instead of the 2,000 provided for in paragraph (d), is similarly unconstitutional.

Accordingly, under constitutional standards appellant Backal is entitled to a place on the ballot. Concur—Kassal, J. P., Ellerin and Wallach, JJ.

Smith, J., dissents in a memorandum as follows: I dissent from the decision of the majority because the record before us is inadequate to support a conclusion that Election Law § 6-136 (2) (b) is unconstitutional. The majority determines that Lee Holzman should remain on the ballot as a candidate for

Surrogate of Bronx County, that Lorraine Backal should be added to the ballot, and that the case of Hansel McGee should be remanded to give the Holzman respondents an opportunity to establish sufficient fraud to reduce the McGee signatures to less than 2,000. I believe that only Holzman has met the requirements of the Election Law to be on the ballot. Moreover, if Election Law § 6-136 (2) (b) is held unconstitutional, there is no adequate basis for ordering Backal added to the ballot while remanding the McGee case for further proceedings.

The majority concludes that Election Law § 6-136 (2) (b) is unconstitutional because it requires a candidate for Surrogate of Bronx County to obtain 5,000 signatures while requiring a candidate for Surrogate in counties with a greater population than The Bronx to obtain only 2,000 signatures. This issue was not argued in the trial court and no testimony was heard on it.

In *Gjersten v Board of Election Commrs.* (791 F2d 472 [7th Cir 1986]), the Court of Appeals affirmed a holding by a District Court that an Illinois statute requiring candidates for the office of ward committeeperson in Chicago to submit a nominating petition containing the signatures of 10% of the electors in the ward, while requiring candidates for the office of township committeeperson to obtain the signatures of only 5% of the electors in the township, was a denial of the equal protection of the law under the Federal Constitution. The Seventh Circuit upheld the District Court's injunction against the use of the 10% requirement but reversed the determination to conduct special elections and remanded the case for further proceedings.

In the *Gjersten* case *(supra),* the Court of Appeals had an adequate record on which to make a determination. Referring to the proceedings in the District Court, the Seventh Circuit stated *(supra,* at 477), "Rather, its opinion reflects a careful analysis of the pleadings, the statute, the affidavits, the evidence of the statute's effect in past elections and the evidence presented during a two-hour hearing on the motion for a preliminary injunction." In this case, the only constitutional issue argued before the trial court was the inequity of forcing candidates for Surrogate to obtain 5,000 signatures within 15 days (the time remaining to gather signatures after the Court of Appeals determined that the former Surrogate of Bronx County should be removed from office) while other candidates had 37 days. Thus, unlike *Gjersten,* the issue of the difference in the required signatures in New York City and other coun-

ties was not addressed in the pleadings or affidavits, there was no evidence of the effect of Election Law § 6-136 (2) (b) on past elections and there was no two-hour presentation of evidence prior to the imposition of a temporary injunction.

The inadvisability of declaring the section unconstitutional without an adequate record is highlighted by an argument in the brief of the Attorney-General, submitted after oral arguments. In it he asserts that the difference between the number of signatures required within New York City and elsewhere is due, in part, to the burden of securing signatures outside of the City of New York. He goes on to cite several differences in the population density within and outside of New York City. These differences include the following:

Bronx County: A population of 1,168,972 persons, 42 square miles and a population density of 27,832.7 persons per square mile.

Richmond County: A population of 352,121 persons, 59 square miles and a population density of 5,968.2 persons per square mile.

Suffolk County: A population of 1,284,231 persons, 912 square miles and a population density of 1,408.1 persons per square mile.

Broome County: A population of 213,648 persons, 712 square miles and a population density of 300.1 persons per square mile.

If section 6-136 (2) (b) is being attacked as constitutionally invalid, the Attorney-General and the Holzman respondents should be given an opportunity to develop their contention that the differences in the number of signatures required on nominating petitions are reasonable.

The fact that Election Law § 6-136 is a reasonable determination by the Legislature as to when a candidate has made a showing sufficient to be placed on the ballot is a further argument against ruling the section unconstitutional without an adequate record. Section 6-136 (2) (b), which requires a candidate for any office which is to be filled by all of the voters of any county or borough within the City of New York to obtain 5,000 signatures, is but a part of a larger design by which the Legislature has determined the number of signatures needed to qualify for the ballot in all elections in the State. That design should not be overturned or disturbed on a record which is virtually nonexistent.

The majority's conclusion that section 6-136 violates the

one-person, one-vote rule enunciated in *Gray v Sanders* (372 US 368, 381 [1963]) is appealing. But that rule should not be used to replace a thorough examination of the system for placing a candidate's name on the ballot, an examination which has not taken place here.

Secondly, the majority orders the name of Lorraine Backal added to the ballot but directs a remand of the McGee case to see if fraud can be established. There is no justification for the difference in treatment. In both the Backal and McGee cases the Board of Elections made a determination of the number of valid signatures. In the Backal case the Referee and the Judge reviewed the figure of the Board of Elections and adjusted it according to the evidence. In the McGee case the Referee heard some evidence concerning the fraud charges but made no finding because he determined that the application by the Holzman respondents to invalidate McGee's petitions was moot once McGee conceded that he could not reach the 5,000 figure.

Specifically, following the filing of the McGee petitions, the Board of Elections made the following determination:

Total number of signatures in petition      11,690
Total number of invalid signatures            7,104
Total number of valid signatures              4,586.

The Holzman respondents contend that the 4,586 figure in the McGee case should be reduced even further because of fraud. Despite this contention, only one person, Maria Ramos, testified on August 13, 1987 as a witness on the fraud claim. The only other witness actually available to testify, according to the record, was a process server who, several days prior to August 13, was to give evidence about the difficulties in subpoenaing the persons who obtained the signatures on the McGee petitions. While the Holzman respondents contend that they were ready to continue on their fraud claim on August 13 and could have presented evidence to reduce the number of 4,586 valid signatures found by the Board of Elections, the scanty record presented here (without the testimony before the Referee or the arguments of the attorneys before the Referee or court) indicates that the Referee closed the hearing only after the testimony of the only witness in court on the fraud claim. The present record does not reveal the names of any other witnesses on the fraud claim or what their testimony would be. There is also no showing that fraud would eliminate over 2,500 of the 4,586 signatures. Given these facts, this court can make its own determination of the

number of valid signatures presented by McGee based upon the 4,586 figure determined to be valid by the Board of Elections, the Referee's determination that when McGee rested, he had failed to meet the 5,000 burden by 284 signatures and any reduction resulting from the testimony of Maria Ramos (a maximum of 81 signatures determined to be valid by the Board of Elections).

In summary, I would affirm the determinations that both McGee and Backal should be stricken from the ballot. If the determinations are reversed, however, both Backal and McGee should be added to the ballot without any remand.