Hansel L. McGEE, Robert A. Mack, Kenneth W. Drummond, Wilbert T. Lawton, and Aida N. Rodriguez, Plaintiffs,

and

Lorraine Backal, Irene Chew, and Wilfred Cancel, Plaintiff-Intervenors,

v.

BOARD OF ELECTIONS OF the CITY OF NEW YORK and the State of New York, Defendants,

and

Jeffrey R. Korman and Lee J. Holzman, Defendant-Intervenors.

No. 87 Civ. 5608 (EW).

United States District Court, S.D. New York.

Sept. 10, 1987.

---

See also, 666 F.Supp. 609.

Kellner, Chehebar & Deveney, New York City, for plaintiffs; John Patrick Deveney, of counsel.

Kathryn E. Freed, New York City, for plaintiff-intervenors.

Peter L. Zimroth, Corp. Counsel for the City of New York, New York City, for defendant Board of Elections of the City of New York; Anne Carson, Asst. Corp. Counsel, of counsel.

Robert Abrams, Atty. Gen. of the State of N.Y., for defendant State of New York; Tarquin Jay Bromley, Asst. Atty. Gen., of counsel.

Dubliner, Haydon, Straci & Victor, New York City, for defendant-intervenors; Paul A. Victor, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

Plaintiffs Hansel L. McGee ("McGee") and various citizens of the Bronx County who support his candidacy, and plaintiff-intervenor Lorraine Backal ("Backal") and various citizens of Bronx County who support her candidacy move for a preliminary injunction directing that the Board of Elections of the City of New York place McGee and Backal on the ballot in the Democratic Party primary for Surrogate, Bronx County, to be held on September 15, 1987, and for a stay of thirty days on voting at that primary election. The plaintiffs claim that section 6–136(2) of the New York Election Law is an unconstitutional barrier to political association and access to the ballot. The defendants move for dismissal. After hearing extensive argument of the parties and intervenors, and upon a review of the affidavits, briefs, and exhibits submitted by the parties in support of and in opposition to their respective motions, this Court grants summary judgment in favor of the defendants.

### Background

Familiarity is assumed with this Court's prior ruling, which abstained from deciding the constitutional claim presented by plaintiff Hansel L. McGee.[1] In that instance,

---

1. *McGee v. Board of Elections,* 666 F.Supp. 609 (S.D.N.Y.1987).

McGee was joined by co-plaintiff citizens and residents of Bronx County, in asserting that the fifteen day time period allowed for the collection of signatures for designation on the Democratic primary ballot for the special election for Surrogate, Bronx County, was unconstitutionally limited (the "time period" claim). Subsequently in the then pending State court action, the Referee, based upon the conceded lack of 5,000 valid signatures on the McGee designating petitions, recommended to the Supreme Court dismissal of McGee's petition. With reference to this Court's order of abstention, the Referee received the pleadings in this action and submitted to the State Supreme Court Justice this Court's ruling and the memoranda that had been filed in support and opposition by the respective parties.

The State Supreme Court Justice took note of McGee's claim before this Court that Section 6–136(2)(b) of the New York Election Law, which requires 5000 valid signatures to be placed on the ballot for any county-wide office in any of the five counties of New York City, was unconstitutional when the time to collect those signatures was reduced from the usual 37 day period to fifteen days, which resulted when the office for Surrogate, Bronx County became vacant following the removal of the incumbent from office by the New York State Court of Appeals.[2] The State Supreme Court upon an analysis of various facts, among other matters noted McGee's activities (and those of other candidates) with respect to obtaining valid signatures and that the fact "that 5,000. valid signatures were not gathered is attributable not to the time constraints as alleged, but to the carelessness of and mistakes committed by the McGee supporters. Moreover all candidates for this position were subject to the same signature requirements within the same time frame." [3] The presiding State Supreme Court Justice, applying the rationale of *Storer v. Brown* [4] to the in-

stant facts, found that the New York State statute was not unduly burdensome and was not unconstitutional. Accordingly, the State Court Justice dismissed McGee's action to have his name placed upon the ballot because he lacked the sufficient valid signatures, and denied his application to have the State statute declared unconstitutional.

Upon appeal to the Appellate Division, First Department, McGee renewed his constitutional claim, to which he added another that Section 6–136(2)(b) of the Election Law, which requires 5000 valid signatures to place the name of a candidate on the ballot in a county-wide race in New York City, is unconstitutional because it requires the candidate, in this instance McGee, to obtain at least two and a half times the number of signatures a candidate for a county-wide office in counties outside the City of New York would be required to obtain for a position on the ballot.[5] McGee contended that in counties outside the City of New York, some of which are larger in population than Bronx County (such as Nassau County and Suffolk County), candidates for Surrogate and other county-wide offices are required to obtain only 2000 valid signatures, and thus, that the 5000 signature requirement for Bronx County and other New York City counties evidences a geographic disparity that is an irrational classification unnecessary to serve a compelling state interest (the "geographic disparity" claim). The Appellate Division, with one Justice dissenting, upheld that claim, and stated that the requirement of 5000 valid signatures ignored the "one-person, one vote" equal protection requirement. The court, accordingly, held that the required number of valid signatures was only 2000 for designation on the Democratic primary ballot for the Surrogate position in Bronx County, and remanded the matter to the Supreme Court for a determination of whether McGee's petitions

2. *See* N.Y.Elec.L. §§ 6–134(6) and 6–158(1).

3. *McGee v. Korman,* Index No. 16172/87 (N.Y. Sup.Ct.1987).

4. 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974).

5. *McGee v. Korman,* App.Div., 518 N.Y.S.2d 940 (1st Dept.1987).

had the required 2000 valid signatures, which upon remand the parties stipulated that his petitions did meet that requirement.

The other parties in the state court action then appealed to the New York State Court of Appeals as of right, which appeal as of right was denied, but the Court of Appeals granted leave to appeal, and on August 27, 1987, the Court of Appeals reversed the decision of the Appellate Division and reinstated the decision of the Supreme Court dismissing the McGee petition.[6] The Court of Appeals based its decision on the procedural ground that McGee could not raise for the first time on his appeal to the Appellate Division the ground upon which he had prevailed in that court, to wit, that section 6–136(2)(b) of the New York Election Law was unconstitutional in the requirement that 5000 valid signatures are required for designation on a primary ballot for the position of Surrogate in Bronx County, while candidates for the same office in counties outside New York City require only 2000 valid signatures. The Court of Appeals stated that the procedural requisites for raising that constitutional claim also had not been met because the Attorney General of New York was not notified of the claim, in accordance with New York law.[7]

Candidate Backal originally sought relief in the New York State courts. In recommending that the Backal petition be denied, the Referee's report stated that the invalid signatures obtained by the Backal supporters were largely the result of the fact that "[m]any of [her] workers were unsophisticated in the process of gathering signatures on petition sheets including not knowing their own A.D. [Assembly District]." The State Supreme Court Justice found that Backal had 4,697 valid signatures and accepted the Referee's report and recommendation that Backal be denied a place on the primary ballot.[8] The Appellate Division reversed the Supreme Court ruling, on essentially the same grounds as in *McGee v. Korman*.[9] The Court of Appeals reinstated the Supreme Court decision in an appeal consolidated with that in the McGee case.[10]

## Discussion

Parties attacking the constitutionality of a duly enacted state statute have the burden of establishing the unconstitutionality of that statute.[11] Plaintiff McGee and his co-plaintiffs have filed an amended complaint attacking the constitutionality of Section 6–136(2)(b) of the New York State Election Law. Plaintiff-intervenor Backal and her co-plaintiffs have filed a complaint alleging similar claims.[12] The candidates make a two-pronged constitutional attack. They allege (1) that the fifteen day period provided for the gathering of designating signatures for placement on the ballot in the race for the Democratic nomination for Bronx Surrogate is less than the 37 day period normally allowed for the equivalent offices and imposes an undue burden on candidate access to the ballot and (2) that the geographic disparity in 5,000 designating signatures required for placement on the ballot for primary race within the counties of New York City, as against the 2,000 signatures requirement in Nassau and Suffolk Counties, with populations of at least, if not larger than, that of Bronx County,

6. *McGee v. Korman*, 70 N.Y.2d 225, 519 N.Y. S.2d 350, 513 N.E.2d 236 (1987) (per curiam).

7. N.Y.Exec.L. § 71 and N.Y.Civ.Prac.L. & R. § 1012.

8. *Backal v. Korman*, —— N.Y.S.2d ——, Index No. 16102/87 (N.Y.Sup.Ct.1987).

9. *Korman v. Backal,* App.Div., 518 N.Y.S.2d 976 (1st Dept.1987).

10. *Korman v. Backal,* 70 N.Y.2d 225, 519 N.Y. S.2d 350, 513 N.E.2d 236 (1987) (per curiam).

11. *See Metropolitan Life Ins. Co. v. Brownell,* 294 U.S. 580, 584–86, 55 S.Ct. 538, 540–41, 79 L.Ed. 1070 (1935).

12. At oral argument on these motions, all parties conceded that regardless of the standing of Backal and McGee to assert their claims, under *Tarpley v. Salerno,* 803 F.2d 57, 60 (2d Cir.1986), the voters who supported those candidates are sufficiently independent to not be barred by any res judicata effects that may adhere to the candidates. To simplify matters, the Court will refer to the plaintiffs and plaintiffs-intervenors as "plaintiffs."

violates the equal protection clause of the fourteenth amendment. The plaintiffs assert that the time period and geographic disparity evident in section 6–136(2)(b) are irrational and arbitrary enactments that deny plaintiffs their rights to freely associate, to run for public office, and for citizens to vote for the candidates of their choice.

In general, the right to vote in a primary will receive protections similar to those in general elections; however, because primaries are a remedial measure designed to increase voter participation in the selection process and are not found everywhere, the main concern of the courts is that arbitrary and capricious classifications are avoided.[13] Likewise, in election cases generally, absent a showing of invidious discrimination based upon wealth or race classifications or a preclusion of the right to vote, heightened scrutiny is not required.[14] This case does not involve either of the classifications deemed to require a heightened scrutiny. Only with respect to their geographic disparity claim do plaintiffs assert that the New York Election Law is racially discriminatory; however, there is no showing of a discriminatory intent or impact behind the passage of the law. To bolster their claim of racial discrimination, plaintiffs do allege that there is a greater concentration of minorities in New York City than elsewhere in New York State and, thus, assert that the geographic disparities found in section 6–136(2)(b) evidence an invidious discrimination based upon race. No legislature history accompanies this section of the New York Election Law; but it is clear that an unsupported hypothesis of the plaintiffs "simply do[es] not support an inference of the kind of racial animus discussed in, for example, *Arlington Heights.*"[15] Plaintiffs also have not succeeded in showing that New York State "substantially burdened the 'availability of political opportunity.'"[16]

There are no arbitrary classifications present in this case. In fact, the equal protection claims of the plaintiffs may be easily disposed of because there is presented in this case no disparate treatment of participants in the primary election for Surrogate, Bronx County. Neither the time period nor the geographic disparity between the 5,000 signatures required in Bronx County primaries and the 2,000 signatures required in Nassau and Suffolk Counties distinguishes[17] or victimizes smaller parties or independents at the expense of the established parties.[18] In this action, all of the candidates for the Surrogate's seat in the Bronx were subject to the same constrictions. The whole controversy is within the confines of one of the major parties, in a particular county of New York. Thus, the action here does not implicate any of the primary concerns found in Court decisions on ballot access.

Plaintiffs' first claim, based upon the fifteen day time period for the collection of designating signatures in the Surrogate race for Bronx County, does not constitute a constitutional violation because the State is justified in requiring that a candidate show a modicum of support within the relevant population before his or her

---

13. *Fidell v. Board of Elections of the City of New York,* 343 F.Supp. 913 (S.D.N.Y.1972), *aff'd* 409 U.S. 972, 93 S.Ct. 310, 409 U.S. 972 (1972).

14. *See McDonald v. Board of Elections,* 394 U.S. 802, 807, 89 S.Ct. 1404, 1407, 22 L.Ed.2d 739 (1969); *see also Unity Party v. Wallace,* 707 F.2d 59, 63 (2d Cir.1983).

15. *Butts v. City of New York,* 779 F.2d 141, 147 (2d Cir.1985) (referring to *Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)).

16. *Munro v. Socialist Workers Party,* —— U.S. ——, 107 S.Ct. 533, 540, 93 L.Ed.2d 499 (1986)

(citing *Lubin v. Panish,* 415 U.S. 709, 716, 94 S.Ct. 1315, 1320, 39 L.Ed.2d 702 (1974)).

17. *Illinois Board of Elections v. Socialist Workers Party,* 440 U.S. 173, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979).

18. *See generally Anderson v. Celebrezze,* 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983) (Ohio filing deadline unconstitutionally impacts independent candidates); *Williams v. Rhodes,* 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968) (holding an Ohio statute unconstitutional because it invidiously discriminates against new parties by giving advantages to the two older, established parties).

name is placed upon the primary ballot.[19] The shortened time for collection of signatures in the case of a special election is not an arbitrary and capricious act but one designed by the legislature to protect the rights of the voters to choose a party nominee through a primary vote, while also protecting the voters from confusion due to a plethora of unsupported candidates. The legislature has decided that primaries may be held for vacancies unless the vacancy occurs less than a week before the last day for circulating designating petitions.[20] In that situation, for county-wide offices, a party's nominee is chosen by "a majority vote of a quorum of the members of a county committee or committees elected in the political subdivision in which such vacancy is to be filled, or by a majority of such other committee as the rules of the party may provide."[21] The legislature has made a reasoned decision about when the period for collection of the required number of signatures is too short to allow proper compliance with procedures designed to protect the integrity of the electoral process. Thus, in that instance, no primary is held, and the voters have no choice of designating a party nominee. However, when a vacancy occurs more than one week before the last day for circulating designating petitions, as in the case of the Surrogate for Bronx County, the Legislature has determined that there is a reasonable time to gather the requisite signatures; accordingly, the voters may still choose the party's nominee at a primary election.

In the case of the primary election for Surrogate in Bronx County, the normal 37 day period for the collection of designating signatures[22] was foreshortened to 15 days as a result of the date of removal of the incumbent by the New York State Court of Appeals. There has been, however, no showing that the fifteen day period placed an undue burden upon access to the ballot in the Democratic primary for Bronx Surrogate. Candidates Holzman, the successful candidate, and Backal each succeeded in gathering over 12,000 designating signatures; while candidate McGee collected over 11,000 signatures, far in excess of the required 5,000 signatures. Thus the claim that the fifteen day period was a deprivation of a right to obtain the required signatures fails of its own weight. That there were numerous invalid signatures had no relationship to the time factor. The Supreme Court of the State of New York, Bronx County specifically found that in the cases of McGee and Backal the failure to gather 5,000 valid signatures was the result of errors by the collectors, and not the shortened time period. As noted above, State Supreme Court Justice Mugglin found that the collectors for McGee were "careless." Plaintiffs admit that of the signatures gathered by the supporters of McGee 1053 signatures were invalidated because of errors in the completion of the subscribing witness' statement; that 475 signatures were invalidated because the election district or address was incorrect; and that 221 signatures were invalidated because the name, address, or date was incomplete.[23] In the case of Backal, her supporters succeeded in collecting 4,697 valid signatures despite the fact that numerous signatures were invalidated because they were duplicates of signatures on petitions for other candidates; the subscribing witness statement was initialed by one other than the subscribing witness; the initialling of the date of the signer was by one other than the subscribing witness; and the listing of old election districts when the Board of Elections had properly complied with notification requirements for

---

**19.** *Storer v. Brown*, 415 U.S. 724, 730, 94 S.Ct. 1274, 1279, 39 L.Ed.2d 714 (1974) ("there must be a substantial regulation of elections [by the States] if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.")

**20.** N.Y.Elec.Law § 6–116.

**21.** N.Y.Elec.Law § 6–116.

**22.** Under New York law, valid designating petitions may not be collected more than twelve weeks before a primary election, N.Y.Elec.L. § 6–134(6), or later than the ninth Thursday before the primary election, N.Y.Elec.L. § 6–158(1).

**23.** Amended complaint paragraph 12.

changes in election districts.[24] Thus, the shortfalls in valid signatures had no relationship to the fifteen day period for the gathering of valid signatures.

All that has been shown is that several candidates failed to follow the legal requirements for collecting valid signatures. In effect, having failed to secure the required number of valid signatures, the candidates are making pleas for leniency. Neither of the candidate-plaintiffs for the Surrogate office can assert that they have been treated unfairly with reference to other candidates in the same race. None of the allegedly aggrieved voters has had his or her vote diluted with reference to another voter involved in the same election.

As for the second equal protection claim, plaintiffs state that they have been deprived of equal protection of the laws by Section 6–136 of the New York State Election Law, which provides that:

(2) All other [i.e. not for statewide races] petitions must be signed by not less than five percentum, as determined by the preceding enrollment, of the then enrolled voters of the party residing within the political unit in which the office or position is to be voted for, provided, however, that for the following public offices the number of signatures need not exceed the following limits:

\*   \*   \*   \*   \*   \*

(b) For any office to be filled by all the voters of any county or borough within the City of New York, five thousand signatures;

\*   \*   \*   \*   \*   \*

(d) For any office to be filled by all the voters of cities or counties, except the city of New York and counties therein, containing more than two hundred fifty thousand inhabitants according to the last preceding federal enumeration, two thousand signatures;

(e) For any office to be filled by all the voters of cities or counties containing more than twenty five thousand and not more than two hundred fifty thousand inhabitants, according to the last preceding federal enumeration, one thousand signatures.

The plaintiffs allege that this section creates an unconstitutional geographic distinction between candidates in the Bronx and elsewhere because the minimum number of signatures required in county-wide races in Nassau and Suffolk Counties, two counties with higher populations than the Bronx, is 2000. This claim too must fall. Since *Storer v. Brown*,[25] the Supreme Court has recognized that States have a "compelling interest" in maintaining the integrity and fairness of the electoral process by ballot access limitations, and that this goal may be accomplished by requiring that candidates for a particular office "obtain a modicum of support" before he or she is placed on the ballot.[26] The 5,000 designating signature requirement in county-wide races in one of the five counties of New York City, the 2000 signature requirement in counties with greater than 250,000 inhabitants,[27] and the 1000 signature requirement in counties of between 25,000 and 250,000 persons[28] only come into operation when that minimum number (i.e. 5,000., 2,000. or 1,000.) is less than five percent of the party enrollment for the party holding the primary race at issue in that county.[29]

Plaintiffs assert that geographical distinctions may not be made when limiting access to the ballot. The Supreme Court decision in *Illinois Board of Elections v. Socialist Workers Party* is factually inapposite to this case because the Illinois law that was declared unconstitutional required independent candidates and new political parties seeking offices within Chicago to obtain more signatures than required by

**24.** *Backal v. Korman*, —— N.Y.S.2d —— (N.Y. Sup.Ct.1987).

**25.** 415 U.S. 724, 736, 94 S.Ct. 1274, 1282, 39 L.Ed.2d 714 (1974).

**26.** *Id.* at 732, 94 S.Ct. at 1280.

**27.** N.Y.Elec.L. § 6–136(2)(d).

**28.** N.Y.Elec.L. § 6–136(2)(e).

**29.** N.Y.Elec.L. § 6–136(2)(b), (d), (e).

Illinois in cases of statewide elections.[30] That case is inapplicable to the present instance because there has been no showing that the 5,000 signatures required in the Surrogate's race in the Bronx is greater than 5% of the enrolled Democratic Party voter population in the Bronx, which is the relevant threshold chosen by the State to determine whether a modicum of support has been established.

The Legislature of the State of New York has decided that though 5% of the party enrollment for a particular election is the general requirement for showing the modicum of support to be placed on the ballot, a lesser showing will be allowed in specific contests. This lenity does not work a detriment to the interests of the candidates in the Bronx Surrogate race. First, the candidates in the Bronx county-wide races are running against candidates similarly encumbered. Second, the candidates in the Bronx county-wide races do not share responsibilities with candidates outside of the Bronx, thus there is no vote dilution of voters in the Bronx Surrogate race relative to, for example, voters in the races for Surrogate in any other county in New York State.[31]

The legislature has reduced the number of signatures required in certain instances to allow greater access to the ballot by decreasing the burden of support necessary for such access. The legislature has decided that in specific races, such as county-wide, assembly-district, or senate-district primary contests, the reduction in the required showing of support does not adversely impact the integrity of the electoral process. To further the goal of providing access to the ballot with a showing of a "modicum of support," the legislature has decided that the density of the population in a given geographic area, as well as the

population, is relevant to the determination of requisite support.

The statutory framework created by the Legislature recognizes and accounts for the fact that gathering signatures is likely to be less difficult in more densely populated urban areas, such as in the counties of New York City. It is self-evident that canvassing a neighborhood for signatures in a densely populated county of New York City, such as Bronx County, with its blocks of high rise apartment buildings and convenient local transportation, is easier than canvassing a neighborhood in a sparsely populated rural or suburban area, where many single family dwellings are spread over a vast geographical area. It is a fact that large multi-story apartment buildings in the Bronx could have sufficient populations of registered Democrats to fill the 5,000 signature requirement. In New York City hundreds, if not thousands of persons, often inhabit a block, or even one building, while in suburban areas, such as Nassau County, or rural areas, as in much of Suffolk County, the single family homes, the large size of the counties in which they are located, and lesser population densities make more difficult the gathering of signatures. Thus, the five counties of New York City are set aside for special treatment because the City, with the highest population density in the State and a relatively small physical area, has a population density of 23,493.8 per mile while the State as a whole has a population density of just 222.8/mile.[32] In Bronx County, with a population of 1,168,972, the population density is 27,832.7/mile whereas Nassau County, with a population of 1,284,231, has a population density of 4,604.8, and Suffolk County, with a population of 1,321,582, has a population density of 1,408.1.[33] The population density of Bronx County, which is

---

**30.** 440 U.S. 173, 184–87, 99 S.Ct. at 990–92, 59 L.Ed.2d 230 (1979).

**31.** Judges of the surrogate's court in each county of New York State preside over affairs within that jurisdiction. The term of office is fourteen years for surrogates in the counties of New York City and ten years for surrogates in counties outside New York City. *See* N.Y. Const. Art. 6, § 12(c).

**32.** The New York State Statistical Yearbook—1985–86, published by the Nelson A. Rockefeller Institute of Government and the State University of New York (SUNY) in cooperation with the New York State Division of the Budget.

**33.** *Id.*

more than 6 times that of Nassau County and almost 20 times that of Suffolk County, allows for easier access to the relevant population for soliciting signatures in county-wide primary races in the Bronx than in county-wide races in the more populous but more extensive geographic counties of Nassau and Suffolk.

Plaintiffs assert that the lenity shown by the State in reducing the burden in certain county-wide races in New York City from 5% of the registered voters to a minimum of 5000 signatures is irrational and arbitrary.[34] Bronx County still has a significantly higher population density than the only two counties outside New York City that are more populous.[35] It is not the function of a court to substitute its judgment for that of the duly elected representatives of the people of a State.[36] Gearing the required number of signatures to the population density of the relevant electoral area is a rational method of protecting the public's interest, the candidates' interests, and the voters' interests.

Summary judgment is granted in favor of the defendants.

So ordered.

34. Plaintiffs claim that the population density rationale is not evident in the statute because Dutchess County, with a population of 245,055 and a population density of 304.8/mile, is within the grouping that requires a 1,000 signature minimum in instances where the party enrolment for the county-wide race at issue is greater than 20,000; while both Oneida County, with a population of 253,466 and a population density of 207.9, and Orange County, with a population of 259,603 and a population density of 314.8, require 2,000 signatures for primary races wherein the enrolment of the party holding the primary is greater than 40,000. This seeming anomaly does not, however, destroy the rational basis of the State's scheme. The State scheme was originally enacted during the Depression and was most recently reenacted in 1977; yet, the anomaly noted above did not occur until the 1980 census. A comparison of the figures from the 1970 and 1980 census shows that during that period Dutchess County gained 10.2% in population from 222,295 to 245,055; Orange County gained 17.1% from 221,657 to 259,603; and Oneida decreased in population by 7.2% from 273,070 to 253,466. While originally the statutory scheme was rationale for these counties as well as overall, the fluctuations in population from 1970 to 1980 slightly altered the setting. This does not affect, however, the rationale basis of the statutory scheme because a State may follow a gradual, step by step approach in implementing a scheme to provide greater access to the ballot. *See McDonald v. Board of Elections*, 394 U.S. at 809, 89 S.Ct. at 1408.

35. Kings County and Queens County also outrank Bronx County in population; but those two counties, which rank number one and two, respectively, in population, are within New York City.

36. *See e.g., Beauharnais v. Illinois*, 343 U.S. 250, 267, 72 S.Ct. 725, 736, 96 L.Ed. 919 (1952).